Harry W. FRENYEAR, Libellant,

v.

UNITED STATES of America, Respondent,

and

Albert Stefanello and Hickey Rinelli, individually and as co-partners doing business under the firm name and style of American Seair Terminal Co., and Beard's Erie Basin, Inc., Respondents-Impleaded.

No. 18528.

United States District Court E. D. New York.

Jan. 19, 1956.

Jacob Rassner, New York City, Mordecai Cohen, Brooklyn, N. Y., for libellant. Harvey Goldstein, New York City, of counsel.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., for respondent United States. Dougherty, Ryan & Mahoney, New York City, of counsel.

Thomas F. Keane, Brooklyn, N. Y., for respondent Beard's Erie Basin, Inc. George Hoffman, Baldwin, N. Y., of counsel.

GALSTON, District Judge.

This libel sets forth that the libellant, on October 19, 1946, was in the employ of the firm of Van Hoesen & Bro., "as a seaman", and was engaged in performing his work on the S.S. Empire Annam. It is alleged that the respondent owned and operated the vessel; that on the day in question it was docked at the foot of Columbia Street in Brooklyn. The libellant alleges that while so employed he was descending a ladder attached to the vessel and was caused to fall from the ladder and was injured. Both the respondent and the respondent-impleaded deny liability and allege that if he was injured it was caused by his own negligence.

The proof in the case is not too clear. It is unfortunate that at the time of the trial nine years had elapsed since the happening of the accident. It is certainly a miscarriage of justice that there should have been this long delay. The libellant frequently was obliged to say that his memory of the details of what took place on October 16, 1946 was not now too clear. The man was undoubtedly honest. He explained that his employment with Van Hoesen & Bro. was as a ship's guard, and that required him to be alert and to look out for sabotage. He said:

"Patrolled ship; sometimes we had to guard three ships, depending upon the size of the ship. We had patrol duty. I was with one man on the rear, there was another man 'midships, and another man forward. Sometimes they had a man inside. As I said before, it depended upon the size of the ship."

When he first went aboard the Empire Annam it was moored against another ship and was not alongside the dock. Later that other vessel, he said, did leave the dock, and the Empire Annam was placed alongside the pier, at the Crane Shipyard, at the foot of Columbia Street, Erie Basin. He was on the ship eight hours a day.

His description of the accident was:

"Well, I was about to be relieved, I was going down the ladder; I got about half way down, I thought it was giving way with me, it was shifting off the dock, and the first thing I knew, it slammed and I went into the water as high as my chest, and I hung there. I hit my knees against the side of the ship, and I hit my head and my back and strained my back."

The libellant said that the foot of the ladder went off the dock because "it wasn't moored right, tied up right, or something." He admitted that the ladder itself was in good shape, and it seemed to be so at the time that he climbed the ladder to go on board the vessel at 7 A.M. He said the bottom was poorly placed, "the dock was an old dilapidated dock, and the ladder looked to me like one of those light painter's ladders. I do not think it is a ship's ladder, ships' ladders are different." It was lashed to the railing of the vessel "at

the top" with a rope, and at the time of the accident nothing occurred, so he said, to the rope. In other words, the ladder was still lashed to the vessel. The ladder extended above the rail of the ship about three or four feet. Frenyear estimated the length of the ladder to be about thirty feet, and the width about two or three feet. His testimony proceeded:

"Q. Now, how far down were you when you felt yourself slipping? A. I will try to remember, it is pretty long, ten years is quite a while to remember. Well, I should say about three-quarters. * * * I felt something giving on the ladder, I didn't know which way, whether to jump or still hold on to the ladder, so I did the best thing I knew of, to hold onto the ladder, I had something to hold onto. The first thing I knew I was up to the side of the ship and down the ladder went. * * * I didn't fall down from the ladder. I was knocked sort of semi-unconscious. I didn't know which way I was going, whether I was going in or holding, and I hit my head on the back of the dock, I imagine, my head was bleeding, I was semi-unconscious."

He was up to his chest in the water, holding on to the ladder. He called for help, but his partner could not get down to help him. Two other men came from another ship, "and they laid on their stomachs and reached over and pulled me up by the back of my neck." It appeared that there was no crew on board.

In cross-examination he admitted that he did not know who had moored the ladder, nor indeed who owned it.

The only other eye witness of the occurrence who testified was John Conroy, who was employed also by Van Hoesen & Bro. Conroy also acted as a guard or watchman, but on a different shift from that of the libellant. His deposition was taken by the respondent, but offered in evidence by the libellant. His description of the libellant's fall from the ladder differed from that given by the libellant himself. He explained that as the vessel was moored at the foot of Columbia Street and tied to the pier, she had no crew on board, and was classified as a dead ship. He explained that a dead ship has nobody aboard the ship connected with the ship, "nobody working on board, no seamen, no officers, only the men supposed to come from the agency, private agents, that took charge of the ship." He described the ladder as of about the same dimensions as did the libellant, and said also that it was lashed to the rail of the ship. Conroy was about seventy-five feet from the end of the pier on his walk down Columbia Street to the foot thereof when he saw the libellant climbing down the ladder. He explained:

"When he got down about the fifth rung from the bottom he seemed to just go off the ladder, or the ladder swayed or turned, for he hit the ground or dock."

Later on he explained that he did not know how the libellant slipped, but he did say that the libellant hit the ground and then rolled into the water. After the fall, the upper part of the ladder was still lashed to the rail, nothing had broken, and the bottom of the ladder was at the same angle to the ship as it had been before.

Conroy had used the same ladder before and after the accident, indeed immediately after the accident, and found it in workable order. He left the ship coming down the same ladder.

Asked whether he had noticed whether the ladder would move when the ship moved, he answered that the ladder would automatically move:

"the ship is moving like that with slack lines, that is why they have a slack at the top, a slack line."

He saw nothing wrong with the ladder at any time.

Whatever the difference in the accounts of the fall as recited by the libellant and Conroy, in my view of the case it is not important.

■ The record in the case is very sparse indeed. There was nothing for the respondent to contest. The respondent's case consisted merely of the deposition of Dr. Spaulding, relating to the physical condition of the libellant when he was examined by Dr. Spaulding, and also of the deposition of Conroy referred to above. The great infirmity of the libellant's case was his failure to establish the relationship of Van Hoesen & Bro. to the respondent. The record seems to disclose, as Conroy testified, that the "private agents" (his employers) were in control of the ship at the time of the accident. No testimony revealed who supplied the ladder, or who put it in place. Granted that the libellant was in the employ of Van Hoesen & Bro., it was not proved, as the libel alleges, that he was employed as a seaman. Nor is it established by the proof, as the libel alleges, that the respondent had full knowledge and notice of the fact that the libellant was lawfully engaged in the performance of his work at the time of the accident.

■ Yet despite the failure of proof, the libellant contends that a warranty of seaworthiness of the vessel extended to the libellant under the doctrine of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Petterson v. Alaska S.S. Co., Inc., 9 Cir., 205 F.2d 478, affirmed 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798. These authorities, however, do not warrant the extension of the rule laid down in Seas Shipping Co. v. Sieracki, supra, to the point that the respondent could be held liable to the libellant for failure to provide a seaworthy vessel in the circumstances related. The allegation of the libel that the respondent "operated, managed, controlled, manned, equipped and supplied the vessel" at the time of the accident is denied by the respondent, and was not proved by the libellant, nor did libellant prove that it had a crew or officers aboard.

Now as to the respondents-impleaded, there was no proof of negligence. The respondent's proof certainly showed none.

The libel will be dismissed as against both the respondent and the respondents-impleaded.

Fortunately for the plaintiff, he has been living on a government disability pension and social security. He also received compensation from his employer, Van Hoesen & Bro., under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq.

Concurrently with this opinion appropriate findings of fact and conclusions of law will be filed.